IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Cheryl Belton, | ) C/A No.: 0:15-167-TLW-SVH |
|              Plaintiff, | ) |
| vs. | ) REPORT AND RECOMMENDATION |
| West Marine, Inc., | ) |
|              Defendant. | ) |

In this employment discrimination case, Cheryl Belton ("Plaintiff") sues her former employer, West Marine, Inc. ("Defendant"), alleging race discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII").[1] [ECF No. 43]. This matter comes before the court on Defendant's motion for summary judgment filed on February 2, 2016 [ECF No. 33]. The motion having been fully briefed [ECF Nos. 33, 39, 42, 44, and 45], it is ripe for disposition.

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civ. Rule 73.02(B)(2)(g) (D.S.C.). Because the motion is dispositive, this report and recommendation is entered for the district judge's consideration. For the reasons that follow, the undersigned recommends Defendant's motion for summary judgment be granted.

---

[1] Plaintiff's claims for hostile work environment and retaliation were previously dismissed by the court. [ECF No. 28].

I.      Factual Background

Defendant sells parts, accessories, and clothing for the boating industry and operates a distribution center in Rock Hill, South Carolina, that supplies its retail stores. Pl. Dep. 52:15–17; Tolbert Dep. 52:20–25.[2] Plaintiff was hired by Defendant on November 21, 1999, as an employee in the replenishment warehouse, and she was promoted to the position of process control clerk in the selection and process control departments. Pl. Dep 18:20–22, 51:12–23, 77:1–21. Her supervisors were Charles Tolbert ("Tolbert"), the outbound operations manager, and Jerry Cuddy ("Cuddy"), the process control supervisor. Pl. Dep. 42:9–24.

Plaintiff's Work Performance

During her period of employment, Plaintiff received regular raises and promotions, and her job performance was reviewed as "very good" and "outstanding" on several annual performance evaluations. [ECF No. 39-2 at 30, 31, 50, 53]. However, on May 29, 2012, Plaintiff received a final written warning for "poor work due to neglect." [ECF No. 33-3 at 23]. Plaintiff performed releases on the wrong day, which resulted in Defendant's customers' shipments being delayed by over a week during the biggest sales week of the season. Pl. Dep. 62:16–63:2; Tolbert Dep. 87:3–89:10. Her mistake was costly to Defendant and could have resulted in her termination. Pl. Dep. 60:5–17, 61:3–6, 62:23–24; Tolbert Dep. 87:16–88:15. When asked in her deposition if the mistake rated a nine on a scale of one to ten, she stated that it rated "a hundred." Pl. Dep. at 60:11–14.

---

[2] Plaintiff's and Tolbert's depositions may be found at ECF Nos. 33-2 and 33-4, respectively.

Plaintiff acknowledged that Tolbert and Cuddy were reasonable and kind in allowing her to remain employed. Pl. Dep. 61:9–62:15.

On October 15, 2012, Tolbert issued a written warning to Plaintiff for loafing/idleness and refusal to obey orders pertaining to an incident on October 11. [ECF No. 33-3 at 38]. Plaintiff refused to sign the warning and indicated on the back of the warning that she was not sitting idly, but was completing paperwork. *Id.* at 39; Pl. Dep 92:8–93:1.[3]

Changes in Duties and Schedules

The distribution center experienced an annual seasonal slowdown between mid-September and mid-February. Pl. Dep. 23:11–14, 52:11–14, Tolbert Dep. 52:12–19. During a 2008 slowdown, Defendant laid off some employees, including Plaintiff. Pl. Dep. 52:4–14. During most slowdowns, Defendant released temporary employees and adjusted permanent employees' hours and schedules. Pl. Dep. 23:15–21, 25:5–10; Tolbert Dep. 53:14–54:12. Defendant encouraged cross-training of employees to perform job duties in addition to their general work assignments. Pl. Dep. 25:11–26:17. Cross-trained employees could fill in for other employees and obtain hours in other areas during the annual slowdowns. Tolbert Dep. 52:2–8, 54:4–12.

One of Plaintiff's job duties was to perform the "ROPT release,"[4] which required her to print and batch documents that were forwarded to the selection department. Pl. Dep. 17:20, 73:17–21. The selection department then pulled the items from inventory,

---

[3] Defendant also notes Plaintiff received a final written warning for abusive and offensive language in June 2011. [ECF No. 33-1 at 10].

[4] Although the acronym ROPT is not defined, Tolbert indicated they were backorders from Defendant's retail stores. Tolbert Dep. 44:20.

packed them, and sent them to stores. Pl. Dep. 73:11–74:2. The selection department initially worked only on the first shift. Pl. Dep. 75:7–21. However, in mid-September 2012, half of the selection department employees were moved to third shift. Pl. Dep. 75:12–16. Plaintiff, as third shift process control clerk, performed releases for the third shift selection team, which only worked Sunday through Wednesday. Pl. Dep. 66:21–24. Tolbert Dep. 60:24–61:7.

On October 8, 2012, Cuddy sent Plaintiff an email indicating that Margie Smith ("Smith"), a Caucasian employee who worked on the first shift, would be taking over the ROPT release and would be performing it in the afternoon. Pl. Dep. 17:20–24, 18:14–17, 19:15–21, 63:17–19; [ECF No. 33-3 at 18]. Plaintiff had been performing the ROPT release between 8:00 and 8:30 p.m., but this did not allow sufficient time for products to be replenished before the ROPT selectors reported to work at 9:00 p.m. Tolbert Dep. 44:20–45:18. Plaintiff testified that Cuddy's having given the ROPT releases to Smith resulted in Smith receiving overtime pay during the slow season, but Tolbert testified that Smith was expected to perform the releases within her current hours. Pl. Dep. 20:11–19; 30:8–22; Tolbert Dep. 57:11–23.

As a result of ROPT releases being rescheduled for the afternoon, there was no need to have a process control clerk, such as Plaintiff, in the office between the hours of 8:00 p.m. and midnight. Tolbert Dep. 50:10–18. Therefore, on October 8, Tolbert informed Plaintiff that she should begin reporting to work at 12:00 a.m.[5] Pl. Dep. 36:2–3,

---

[5] While the dates are not clear in the record, Plaintiff testified that at one time she reported to work at 8:00 p.m., but was subsequently scheduled to report to work at 9:30 p.m. Pl. Dep. 27:24–25, 36:2–3.

4

38:14–21; [ECF No. 33-5 at 2]. Plaintiff retained her "WCF"[6] release duty, but the time for the release was changed from between 8:00 p.m. and midnight to after midnight. Pl. Dep. 87:2–89:2; [ECF No. 33-3 at 18].

Plaintiff's batching duties, which required marrying up the store documents so the documents were organized by store and by zone, were reassigned to Carmen Lopez ("Lopez"), a Puerto Rican front window clerk, between 8:00 p.m. and 12:00 a.m. Pl. Dep. 21:8–22:6, 27:20–28:5, 131:20–21, 136:22–24; Tolbert Dep. 55:19–57:3. Batching typically takes an hour and is a clerical function. Tolbert Dep. 56:7–17. Lopez was required to do the batching during her existing hours and was not given additional work hours to perform this task. Tolbert Dep. 56:18–24.

Although it was generally Plaintiff's duty to release "normal reports,"[7] Freeman Hayden ("Hayden"), an African-American supervisor in the replenishment department, assigned the task to Pat Debus ("Debus"), a Caucasian employee. Pl. Dep. 34:14–35:23, 152:1–18; Tolbert Dep. 54:14–25. Plaintiff testified that it typically took about ten minutes to run a normal. Pl. Dep. 146:15–24.

As a result of the new operational procedures, Smith and Rita Young, another Caucasian first shift process control clerk, were also given new start times and were instructed to report at 9:00 a.m. on Monday through Friday. Smith and Young typically worked five to six days per week. Tolbert Dep. 60:18–20. Tolbert explained that the first shift process control clerks were receiving more hours during the slow season because

---

[6] The parties failed to define or explain "WCF" releases.
[7] The parties do not explain what "normal reports" or "normals" are, but they agreed that they were only run at Hayden's request during periods when employees in the replenishment department were nearly out of work. Pl. Dep. 205:5–201:10.

5

they had a heavier workload. Tolbert Dep. 28:21–25. He indicated Smith performed process control duties and answered telephone calls from the retail stores and Young performed multiple releases for another department. Tolbert Dep. 29:1–5. He also noted that extending the release time to 5:00 p.m. resulted in the first shift process control clerks working longer hours. Tolbert Dep. 29:5–9. He indicated the first shift process control clerks also used some paid time off to bring their total hours to 40 or more per week. Tolbert Dep. 29:23–30:15. Pl. Dep. 63:12–22, 67:17–23, 68:23–69:6; [ECF No. 33-3 at 26].

Plaintiff's Request for Additional Hours

On the morning of October 9, Plaintiff spoke to Cuddy and requested that she be scheduled to work more hours. Pl. Dep. 39:17–40:6, 78:4–6. Cuddy initially suggested that Plaintiff may be able to work for Hayden in the replenishment department, but the department did not have sufficient work. Pl. Dep. 41:4-9; 78:7–79:3, 151:24–25. Next, Cuddy sent an email directing the appropriate employees to train Plaintiff on voice selection when she reported that night, so that she could work in the selection department. Pl. Dep. 39:20–40:3; [ECF No. 33-3 at 20]. Plaintiff was trained with the Voxware headset system, which consists of a headset through which the associate hears an automated voice directing them to each of the products to pull from inventory. Pl. Dep. 81:3–82:9, 132:24–133:14. Plaintiff was scheduled to begin work in the selection department between 9:00 p.m. and midnight at her same rate of pay. Pl. Dep. 83:17–24, 102:12–19.

On October 11, 2012, Plaintiff expressed frustration with the Voxware device and complained to Cuddy that some of her process control duties were being delegated to others.[8] Pl. Dep. 96:1–5; [ECF No. 33-3 at 35]. She asked Cuddy if she could report at midnight to perform her duties as a process control clerk and discontinue work in the selection department, but Cuddy informed her that she would need to continue to report for work in selection at 9:00 p.m. Pl. Dep. 96:11–13, 134:2–4; [ECF Nos. 33-3 at 35, 39-2 at 72].

Plaintiff's Termination

Plaintiff reported to work for her 9:00 p.m. shift in voice selection on October 15, 16, and 17. Pl. Dep. 101:1–102:3. However, on October 22, 23, and 24, she reported to work around 12:00 a.m.[9] Pl. Dep. 176:7–25. She did not obtain permission from Tolbert or Cuddy to report later, but stated she informed Hayden[10] of her decision to report later when she arrived for work at 12:00 a.m. on October 22. Pl. Dep. 177:7–19, 178:21–

---

[8] Plaintiff stated she became upset because her usual job duties were being delegated to Lopez and Debus while she worked in the warehouse/selection department. Pl. Dep. 93:12–94:5.

[9] Plaintiff was scheduled to begin work at 9:00 p.m. on October 21–24.

[10] Plaintiff maintains that after Tolbert reprimanded her on October 15, he indicated she would be reporting to Hayden. Pl. Dep. 43:20–22,183:7–23. Although Hayden was not a manager in process control, he was the most senior manager who worked during the third shift. Pl. Dep. 43:23–44:2; Tolbert Dep. 77:20–78:4. Tolbert maintains he and Cuddy continued to supervise Plaintiff and to set her hours and that Plaintiff was merely directed to consult Hayden if any issues arose during her shift. Tolbert Dep. 75:14–24, 76:11–18, 78:1–79:3. He stated that an employee's manager would not be changed without the completion of an associate action form and that no associate action form was completed to change Plaintiff's supervisor from Cuddy to Hayden. Tolbert Dep. 77:1–19. Although Plaintiff and Tolbert disagree as to whether Hayden was Plaintiff's supervisor after October 15, Plaintiff admits that she did not seek Hayden's permission before she changed her start time, but rather informed Hayden of her decision after he called to inquire as to why she failed to report for work at 9:00 p.m. on October 21. Pl. Dep. 178:21–180:17.

7

179:12. The next day, she informed Cuddy that she was not reporting to work until midnight. Pl. Dep. 181:4–23. Defendant terminated Plaintiff on October 25, 2012, based on her failure to report to work as scheduled. [ECF Nos. 33-3 at 63, 39-2 at 35].

After Plaintiff was terminated, Defendant moved Young to third shift to cover Plaintiff's process control duties, Lopez's window duties, and some of her previous first shift duties. Pl. Dep. 121:3–6; Tolbert Dep. 40:21–41:3, 43:13–18. On November 2, 2012, Plaintiff filed a charge of discrimination based on race with the Equal Employment Opportunity Commission ("EEOC"). [ECF No. 12-1]. On April 18, 2013, Defendant terminated Kim Ashe, a Caucasian female who worked in process control, for leaving early without permission. [ECF No. 39-2 at 128]. In May 2013, as the busy season commenced, Defendant promoted Betty Burriss, an African-American female, to the position of second shift process control clerk. Pl. Dep. 120:13–122:8, 123:3–5; Tolbert Dep. 41:16–25.

II.   Discussion

   A.   Standard on Summary Judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of

materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

B.  Analysis

A plaintiff may prove race discrimination through direct and indirect evidence or through the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *Price v. Thompson,* 380 F.3d 209, 212 (4th Cir. 2004). The Fourth Circuit has referred to these two avenues of proof as the mixed motive framework and the pretext framework, respectively. *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc). It is left to the plaintiff's discretion whether to proceed using the mixed motive or pretext framework. *Diamond v. Colonial Life & Accident Ins. Co.,* 416 F.3d 310, 318 n. 4 (4th Cir. 2005) ("In the event that a plaintiff has direct evidence of discrimination or simply prefers to proceed without the benefit of the burden-shifting framework, she is under no obligation to make out a prima facie case.").

9

1.      Mixed Motive Case

To use a mixed-motive analysis, a plaintiff may establish a claim of discrimination by demonstrating, through direct or circumstantial evidence, that race discrimination motivated the employer's adverse employment decision. *Hill v. Lockheed Martin Logistics Mgt., Inc.*, 354 F.3d at 285. Although courts used to require direct evidence for a mixed motive case, the Supreme Court held that no such "heightened showing through direct evidence" is required. *Desert Palace Inc. v. Costa,* 539 U.S. 90, 98–99 (2003). Relying upon the plain text of the statute, the Court held that a Title VII plaintiff "need only demonstrat[e] that an employer used a forbidden consideration with respect to any employment practice." *Id.* at 98. "[A] plaintiff need only present sufficient evidence," direct or circumstantial, "for a reasonable jury to conclude, by a preponderance of the evidence, that race, color, religion, sex, or national origin was a motivating factor for any employment practice." *Id.* at 101–02 (internal quotation marks omitted).

Plaintiff argues the following allegations show Defendant racially discriminated against her: (1) that her work hours were reduced, but the work hours of two Caucasian employees, Smith and Young, were not reduced, Pl. Dep. 16:13–17:14; (2) that she was asked to work in the warehouse,[11] but Smith and Young were not asked to work in the warehouse, *id.*; (3) that three of her job duties were given to Caucasian workers—Smith, Lopez, and Pat Debus, *id.* at 16:13–18, 21:2–9, 34:12–35:1; and (4) Plaintiff claims that her employment was wrongfully terminated because of her race. Pl. Dep. Ex. 2; ECF No. 1 at 24.

---

[11] Plaintiff refers to her job in voice selection as working in the warehouse.

Defendant responds that the hours of Smith and Young were not reduced because they worked the first shift, which had a heavier workload. However, even if they were similarly-situated, Defendant granted Plaintiff's request for additional hours by allowing her to work in the warehouse/selection department. Although Plaintiff complains that Smith and Young were not required to work in the warehouse to maintain hours, she has identified nothing beyond her own speculation to prove that Defendant's action were for racial reasons. Additionally, Plaintiff has not explained why working in the warehouse was inferior to working in the process control department. Defendant has provided testimony explaining that its decision was for business reasons, and upon her request, Defendant allowed her to make up the hours in another department. Defendant argues if it had tried to reduce her hours to discriminate against her, it would not have allowed her to replace her hours by working in the warehouse. Defendant has also identified the business reasons for redistributing Plaintiff's tasks, which she has not disputed.

Plaintiff's argument that Defendant's actions were based on a desire to racially discriminate against her are also undermined by the fact that Plaintiff admits that she made a "whopper" of a mistake in May 2012, five months prior to her termination. Pl. Dep. 60:5–63:5. Plaintiff acknowledged that her mistake "was about as bad as it gets" and would have been cause for her termination. Pl. Dep. 63:3–5. Despite having an undisputable ground on which to terminate Plaintiff, Tolbert chose not to terminate her. Plaintiff has presented no evidence explaining why, only five months later, Tolbert and Cuddy sought to terminate her based on her race. After a consideration of Plaintiff's proffered evidence and arguments in the context of the totality of the record, Plaintiff has

failed to present evidence that her termination was racially-motivated. *See Christian v. S.C. Dep't of Labor Licensing and Regulation*, No. 14-2168, 2016 WL 3074312, *6 (4th Cir. 2016).

### 2.     Pretext Framework

To establish a prima facie case of disparate treatment, a plaintiff must show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly-situated employees outside the protected class." *Coleman v. Md. Ct. of App.*, 626 F.3d 187, 190 (4th Cir. 2010).

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for its decision. *Hemphill*, 975 F. Supp. 2d at 557. This is merely a burden of production, not of persuasion. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). Once Defendant meets its burden by producing a legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination *vel non.*" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not the true reason, but was pretext for discrimination. *Reeves*, 530 U.S. at 143. Throughout the burden-shifting scheme set forth in *McDonnell Douglas*, the ultimate burden of proving that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff.

<u>Adverse Employment Action</u>

In the interest of clarity, the undersigned first notes that Plaintiff appears to have alleged only one adverse employment action—her termination on October 25, 2012. To

the extent Plaintiff argues that the change in responsibilities constitute independent adverse employment actions, such claims fail because although her responsibilities changed, she was allowed to maintain the same number of hours at the same pay rate. Pl. Dep. 102:13–19. The Fourth Circuit has held:

> We recognize that the Supreme Court has recently suggested that Title VII liability can arise from a "tangible employment action," which the Court defined to include not only "hiring, firing, failing to promote, . . . [and] significant change in benefits," but also "reassignment with significantly different responsibilities." *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, (1998) (discussing "tangible employment action" as trigger for employer's strict liability under Title VII for supervisor's discriminatory acts); *see also Reinhold v. Commonwealth of Virginia,* 151 F.3d 172, 175 (4th Cir. 1998). In light of the clear precedent indicating that Title VII awards damages "only against employers who are proven to have taken adverse employment action" for a discriminatory reason, *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 52–24 (1993), and based on our certainty that Congress did not intend Title VII to provide redress for trivial discomforts endemic to employment, however, we conclude that reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect on her.

*Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999); *see also James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004) ("Regardless of the route a plaintiff follows in proving a Title VII action,[12] . . . the existence of some adverse employment action is required. . . . It is clear that [the plaintiff] found his new role and responsibilities with [the defendant] less appealing, but that fact in and of itself does not constitute adverse employment action.") (citations omitted).

      Here, Plaintiff has only shown that she found her duties working in the selection department from 9:00 p.m. to midnight less appealing than her previous duties. She has

---

[12] The undersigned notes that the issue of adverse employment action applies also to the mixed-motive analysis.

13

failed to show that the reassignment had a detrimental effect on her.[13] "'[A]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (quoting *Boone*, 178 F.3d at 256–57 (4th Cir. 1999)).

Job Performance

Defendant argues that Plaintiff cannot show she had a satisfactory job performance because she received corrective actions on May 29, 2012, and October 15, 2012, and because she failed to report to work at the assigned time during October 21–25. In response to Defendant's argument that she was not satisfactorily performing her job, Plaintiff states "IN RESPONSE in its entirety Plaintiff has direct evidence that shows Defendant's managers' motives and action of racial discrimination against her." [ECF No. 39 at 24 (errors in original)]. Plaintiff does not elaborate further.

It is undisputed that on October 22, 23, 24, and 25, Plaintiff reported to work around 12:00 a.m., even though she had been scheduled to report three hours earlier on each of these days. Pl. Dep. 176:7–25. She did not obtain permission from Tolbert or Cuddy to report later, but stated she informed Hayden of her unilateral decision to report later when she arrived for work three hours late at 12:00 a.m. on October 22. Pl. Dep. 177:7–19, 178:21–179:12. Later, she informed Cuddy that she was not reporting to work

---

[13] Although reassignment with significantly different job responsibilities may be sufficient to constitute an adverse employment action, see *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011), Plaintiff has failed to make such a showing.

14

until midnight. Pl. Dep. 181:4–23. Plaintiff cannot show she was performing her job satisfactorily because she admits that she refused to report to work at the scheduled time. Because Plaintiff has failed to make a prima facie case of race discrimination, the undersigned recommends the district judge grant Defendant's motion for summary judgment.

III.     Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends Plaintiff's motion for summary judgment be granted.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

July 11, 2016                                      Shiva V. Hodges
Columbia, South Carolina                 United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

15

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Robin L. Blume, Clerk
> United States District Court
> 901 Richland Street
> Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).